**Carol Ann LYONS, M.D.**

v.

**SAINT VINCENT HEALTH CENTER, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Feb. 11, 1999.

Decided April 22, 1999.

Reargument Denied July 1, 1999.

David R. Johnson, Pittsburgh, for appellant.

James D. McDonald, Jr., Erie, for appellee.

Before PELLEGRINI, J., FLAHERTY, J., and RODGERS, Senior Judge.

PELLEGRINI, Judge.

Saint Vincent Health Center (St. Vincent) appeals from an order of the Court of Common Pleas of Erie County (trial court) denying its motion for post-trial relief from a *decree nisi* that restored the clinical privileges of Carol Ann Lyons, M.D. (Lyons), a board-certified radiologist, to St. Vincent's radiology department.

St. Vincent, located in Erie, Pennsylvania, is a general hospital organized as a private non-profit corporation. In October 1983, St. Vincent entered into an exclusive contract[1] with Clinical Associates in Radiology (CAR), a professional corporation, for it to provide all of the radiology services at St. Vincent as an independent contractor. This contract specifically provided that only CAR physicians would have clinical radiology privileges at St. Vincent and that once any of its physicians left CAR's employ, those clinical privileges would be forfeited.[2]

In December 1984, Lyons was hired as a full-time staff physician with CAR. In March 1985, she applied for and was granted appointment to St. Vincent's associate medical staff, and concurrent with her appointment, she was granted clinical privileges in St. Vincent's radiology department. Eventually, Lyons was made a full active medical staff member and was re-appointed to the active medical staff in March 1987, January 1988 and January 1989.

Sometime in 1986, Lyons' employment with CAR changed from full-time to part-time[3] but in July 1989, it returned to full-time; however, the arrangement only lasted for one week due to unsuccessful negotiations concerning the terms of her employment contract and, effective January 11, 1990, Lyons left CAR's employment.[4] She then started Professional Building Radiology (PBR), a corporation she had formed while employed by CAR, and began providing a wide range of diagnostic services, including mammograms, ultrasounds and various other procedures.

When Lyons resigned, CAR notified St. Vincent that she was no longer in its employ. In accordance with the terms of its contract with CAR, when Lyons sought to renew her clinical privileges, the St. Vincent's Board of Trustees (Board) declined to do so; however, her status as a full active medical staff member remained unaffected. Lyons then challenged St. Vincent's decision not to renew her clinical privileges by invoking the appeal procedures provided under St. Vincent's Medical

1. An exclusive contract between a hospital and a provider, i.e., a doctor or a group of doctors, binds both parties to buy or sell only from each other for their total needs in an effort by the hospital to lower costs and to continue to provide reliable health care. Charles R. Galloway, *Observation: Exclusive Contracts and the Staff Physician*, 66 Miss. L.J. 479, 480 (1996). As a corollary to this agreement, physicians without an exclusive contract will necessarily be prohibited from providing the exclusive services at the facility regardless of whether or not they maintain staff privileges there. Bryan A. Liang, *An Overview and Analysis of Challenges to Medical Exclusive Contracts*, 18 J. Legal Med. 1, 2 (1997). Exclusive contracts most commonly concern hospital-based doctors in the specialties of anesthesiology, radiology and pathology. Galloway *supra*.

2. CAR's officers and shareholders are radiologists all with clinical privileges at St. Vincent. The agreement between CAR and St. Vincent provided in relevant part:
   [CAR] presents that it is duly qualified to engage in and perform the medical functions agreed to hereunder and will provide medical practitioners hereunder, who are

licensed under the laws of the Commonwealth of Pennsylvania, and who are and will remain full active staff members of [St. Vincent] at all times during the term of this Agreement. *Any medical practitioner who is presently or who, in the future, is furnished by [CAR] will forfeit his right to retention of membership in the Radiology Division at [St. Vincent] upon occurrence of the termination of this Contract or the termination of his employment by [CAR].* (Emphasis added).

3. In December 1986, Lyons temporarily ceased full-time employment with CAR for maternity leave and returned to part-time employment in April 1987. In February 1988, Lyons temporarily ceased part-time employment with CAR for her second maternity leave and returned to part-time status in April 1988.

4. Lyons was offered a contract valued at $280,000.00 annually, but it did not include an offer of partnership nor did it allow her to simultaneously work with her husband who practiced as an orthopedic surgeon.

Staff By-laws (By-laws).[5] After hearings, the Board re-affirmed the decision to deny Lyons clinical privileges.[6]

In August 1991, Lyons then filed an equity action requesting, *inter alia*, restoration of her clinical privileges.[7] In January 1992, Lyons also commenced a separate breach of contract action[8] asserting that St. Vincent had violated its By-laws by terminating her clinical privileges for reasons not delineated within the By-laws, i.e., the termination of her employment with St. Vincent's exclusive provider, CAR. Lyons requested damages for loss of earnings as a result of her inability to practice radiology at St. Vincent or its affiliates. Both actions were consolidated for all purposes except trial.

St. Vincent defended both actions contending that its decision not to renew Lyons' clinical privileges had not violated its By-laws because (1) her clinical privileges were derived from and contingent upon her employment contract with CAR, which was incorporated by reference into the provision of the exclusive contract between St. Vincent and CAR; (2) its decision to withdraw Lyons' clinical privileges was in accord with the By-laws; and (3) Lyons had not suffered irreparable harm.[9] Ultimately, the case went to trial but all issues of monetary relief, whether at equity or at law, were reserved and deferred.[10]

Lyons presented witnesses who testified that she was harmed as a result of St. Vincent's withdrawal of her clinical privileges because she would not have available to her the latest technologies to be able to maintain her skill as a radiologist; her ability to treat patients admitted to St. Vincent would be limited because she could not consult with the admitting physician, which, in turn, adversely affected the patient's continuum of care; her ability to receive referrals from and establish professional relationships would be impaired; and her ability to recruit an associate would be hindered. Lyons also presented

---

5. Article VII, Section 2, subparagraph A of the By-laws provides that a practitioner has 30 days from the date of an adverse recommendation to submit a written request for a hearing.

6. Although the Board voted to re-affirm the termination of Lyons' clinical privileges, the credentialing committee had voted earlier to renew her application for clinical privileges without regard to the termination of her employment with CAR.

7. The equity action was filed at No. 46–E–1991.

8. The breach of contract action was filed at No. 305–1992 and is still pending before the trial court.

9. The trial court sustained St. Vincent's demurrer to Count II (request for mandatory injunction) and Count III (By-laws do not permit conditioning of privileges upon employment with CAR in violation of state and federal laws) of Lyons' equity complaint and they were stricken; however, it denied St. Vincent's first and second demurrer to Lyons' entire equity complaint and to Count I (wrongful termination of clinical privileges in violation of By-laws).

10. Both parties filed cross-motions for summary judgment; St. Vincent's motion was denied while Lyons' motion was granted. In denying St. Vincent's motion for summary judgment and granting Lyons' partial motion, the trial court found the provisions of the By-laws dealing with qualifications for clinical privileges did not apply to the reappointment/renewal process and, consequently, there was nothing in the By-laws which allowed St. Vincent to terminate Lyons' clinical privileges based solely upon her employment with CAR. St. Vincent filed a motion for reconsideration, which the trial court denied. It then appealed to this Court and we quashed the appeal as interlocutory.

Lyons then filed a motion for final decree in equity in the nature of an injunction requesting reinstatement of her clinical privileges pending the processing of her latest application for privileges without regard to her employment status with CAR. The trial court denied Lyons' motion and entered a *decree nisi*. Lyons filed a motion for post-trial relief requesting that the trial court vacate its previous order but the trial court denied that motion as well. Several months later, the trial court, reversing itself, vacated its previous order and allowed the case to proceed to a non-jury trial limited to issues regarding Lyons' entitlement to injunctive relief.

the testimony of Thomas Bradshaw (Bradshaw), vice president of professional services at Saint Joseph's Hospital in Atlanta, Georgia, as an expert witness in health care administration. He testified that an open staff was the preferred model in hospital administration because of the benefits of competition that it would bring, i.e., that referring physicians would have the option of choosing a radiologist or group that they preferred for the given service. Bradshaw further stated that an open staff provided better coverage for the referring physician.[11]

On its behalf, St. Vincent also presented the testimony of a number of witnesses. In general, they testified that the restoration of Lyons' clinical privileges would be devastating because it would ruin the continuum of care, and create a disruptive force at St Vincent's in the "complexity of scheduling" when attempting to satisfy the demands for one new physician compared to the demands of the competing group, CAR. They stated that this disruption would preclude cooperation from CAR, making the overall retention of staff, professional and non-professional recruitment difficult. They concluded that Lyons was not injured by the loss of her clinical privileges because her expertise in women's health would enable her to generate a significant referral base, and she had already developed such a base through her employment relationship with the Imaging Center.[12]

After the proceedings, the trial court found that St. Vincent had breached its By-laws by not renewing Lyons' clinical privileges based upon her leaving CAR's employ because that was not a criteria contained in the reappointment provisions of the By-laws. It also held that Lyons had suffered irreparable harm because she was unable to use St. Vincent's radiology equipment or perform in-patient services. As a result, it entered a *decree nisi* that St. Vincent was "permanently enjoined from impairing, terminating, restricting or attempting to terminate, impair or restrict [Lyons'] privileges in the Department of Radiology at [St. Vincent], and all affiliates thereof, in a manner inconsistent with the

**11.** Lyons also testified on her own behalf regarding the history of her working relationship with St. Vincent and CAR, and the events that culminated in her termination from both institutions. She explained her clinical skills and the type of work she received and performed, including starting her own corporation as a result of the termination of her clinical privileges. Lyons also described the effect that the loss of her clinical privileges had on her employability, her ability to keep her skills sharp, her interactions with former colleagues and her ability, or lack thereof, to receive referrals.

Lyons also presented the testimony of Linda Fagenholz, M.D., a pediatrician and member of St. Vincent's credentials committee; Michael Scutella, M.D., an OB/GYN and member of OB–GYN Associates of Erie; David Dulabon, M.D., urologist and a member of Saint Vincent Urology Associates; Gregory Prylinski, M.D., a general surgeon at St. Vincent and a courtesy staff member at Hamot Medical Center; John Jageman, M.D., a physician of internal medicine and a shareholder of the Imaging Center before it was purchased by Hamot Medical Center; Richard Hall, M.D., a neurosurgeon and assistant medical director of Hamot Occupational

Health Center and medical director of the Employee Health Services of Hamot Health Foundation; Joseph Thomas, M.D., an anesthesiologist; and Forrest Mischler, M.D., a general surgeon. All of these witnesses testified that Lyons was an exceptionally competent radiologist and would be an asset to St. Vincent if her clinical privileges were restored.

**12.** St. Vincent also presented the testimony of the following witnesses: Sister Catherine Marie Manning, chief operating officer of St. Vincent; Sister Margaret Ann Hardner, president and chief executive office of St. Vincent Health System and a member of the Board; Richard Kocan, M.D., chairman of the radiology department at St. Vincent; Roger Thayer, manager of St. Vincent's radiology department; and Joseph Marasco, Jr., M.D., a radiologist and an expert witness on the relationship between a hospital and an exclusive contract provider. All of these witnesses testified regarding the detriment that would be created if St. Vincent was forced to reinstate Lyons' clinical privileges and operate competitively against CAR, particularly as it pertained to scheduling of equipment use and technical support.

adjudication, order, and decree of this Court." St. Vincent then filed a motion for post-trial relief, which the trial court denied and made its *decree nisi* final. This appeal followed.[13]

On appeal, St. Vincent contends that the trial court:

1. ignored other provisions in the By-laws which allowed it to consider factors such as the exclusive contract and employment with CAR in deciding whether to renew clinical privileges;

2. exceeded its jurisdiction by entering an order allowing Lyons to use its radiology facilities because it impermissibly interfered with the sole and exclusive power of its Board to manage St. Vincent's operations;

3. exceeded its equitable power by issuing an injunction to permanently restore Lyons' clinical privileges because it, in effect, voided CAR's pre-existing exclusive contract to provide radiological services; and

4. erred in finding that Lyons demonstrated "irreparable harm" such that she was entitled to equitable relief.

### I.

At the core of this case is the relationship between doctors and hospitals. In most cases, doctors with staff privileges[14] are not employees of the hospital, but instead, are independent contractors who are granted permission to admit patients and make use of the hospital's facilities and resources. Timothy Stoltzfus Jost, *The Necessary and Proper Role of Regulation to Assure the Quality of Health Care*, 25 Hous. L.Rev. 525, 553 (1988). When the hospital agrees to grant a doctor staff privileges, it enters into an individual binding contract with the doctor.

David J. Behinfar, *Exclusive Contracting between Hospitals and Physicians and the Use of Economic Credentialing*, 1 DePaul J. Health Care L. 71, 74 (1996). While staff privileges alone may be insufficient to allow a doctor to actually provide patient services at the hospital, clinical privileges do when used in conjunction with those staff privileges. *Id.* at 78.

A hospital's procedures for granting, revoking or renewing privileges and the standards to which the doctor must abide are embodied in the medical staff by-laws. June D. Zellers & Michael R. Poulin, *Termination of Hospital Medical Staff Privileges for Economic Reasons: An Appeal for Consistency*, 46 Me. L.Rev. 67, 69 (1994). Under Pennsylvania law, the governing body of a hospital is required to adopt by-laws in accordance with the communal responsibility of the hospital. *See* 28 Pa.Code § 103.3. Medical staff by-laws typically cover the relationship between the doctor and the hospital regarding organization of the doctors into a medical staff with officers and committees; delineation of requirements for obtaining and maintaining privileges; organization of the doctors by departments or specialties; quality control including peer review; issues of confidentiality, immunity and releases; and the adoption of and amendments to the by-laws. John Hulston, Donald Jones & Timothy Gammon, *Do Hospital Staff Bylaws Create a Contract?*, 51 J. Mo.B. 352 (1995); *see also* 28 Pa.Code §§ 107.11 – 107.12. Many jurisdictions, including Pennsylvania, have concluded that medical staff by-laws constitute an integral part of the contractual relationship between a hospital and its staff doctors. Behinfar, *supra* at 75–76; *Berberian v. Lancaster Osteopathic Hospital Association, Inc.*, 395 Pa.

---

13. Our scope of review of the denial of a motion for post-trial relief is limited to a determination of whether the trial court abused its discretion or committed an error of law. *Kiehner v. School District of Philadelphia*, 712 A.2d 830 (Pa.Cmwlth.1998).

14. Medical staffs must define the requirements for admission to staff membership and delineate the requirements for retention of those privileges. 28 Pa.Code §§ 107.2–107.3.

257, 265, 149 A.2d 456, 459 (1959) ("hospital is bound by the staff by-laws just as much as a voluntary association is bound by the provisions of its by-laws ... [because] ... the respective organizations have enacted and approved the by-laws which are an integral part of the contractual relationship between such organizations and their members or ones holding under them"); *Miller v. Indiana Hospital,* 277 Pa.Super. 370, 419 A.2d 1191 (1980); *see also Posner v. The Lankenau Hospital,* 645 F.Supp. 1102 (E.D.Pa.1986), *aff'd,* 865 F.2d 252 (3 rd Cir.1988) (*citing Berberian* and *Miller*). As a result, the by-laws act together with the hospital's contractual agreement with its staff doctors to define their working relationship and both must act in accordance with the by-laws' terms; when making medical staffing decisions, hospitals must act in accordance with their by-laws to avoid judicial review. Behinfar, *supra* at 76.

## II.

While St. Vincent admits that the By-laws do not provide that "exclusive contracts" may be a basis for denying clinical privileges, it argues that an exclusive contract in the radiology department is a relevant factor to be considered under the By-laws when deciding whether to grant, withdraw or renew clinical privileges. Specifi-cally, it points out that the By-laws provide that:

- the Board is responsible for both initial appointments and reappointment (Article II, Section 4, subparagraph A);
- the medical staff will confer only those clinical privileges granted by the Board (Article II, Section 1); [15]
- clinical privileges should be reevaluated at least every two years (Article II, Section 4, subparagraph B);
- St. Vincent has the responsibility to provide adequate facilities or support services; to evaluate and define patient care needs for additional staff; and to determine management plan for a mix of patient services (Article II, Section 3, subparagraph E; Article III, Section 3, subparagraph K; Article IV, Section 3, subparagraph A; Article IV, Section 4). [16]

Based upon the above By-law provisions, St. Vincent contends that the Board had the authority not to renew Lyons' clinical privileges when the exclusive provider CAR no longer employed her because the Board had determined that:

- there was "documented evidence" (i.e., the exclusive contract) that the hospital had an inability "to provide adequate facilities" to a radiologist not affiliated with CAR because CAR had

**15.** Article II, Section 1 of the By-laws entitled "Nature of Medical Staff Membership", provides:

> Membership on the Medical Staff of [St. Vincent] is a privilege which shall be given only to professionally competent physicians ... who, in the judgment of the Board ..., continuously meet the qualifications, standards and requirements set forth in these Bylaws, Rules and Regulations. *Appointment to the Staff will confer on the appointee only those clinical privileges granted by the Board* ... in accordance with these Bylaws and the Rules and Regulations. (Emphasis added).

**16.** All of these provisions contain almost identical language. Typical is Article III, entitled "Delineation of Clinical Privileges", which in Section 3, subparagraph K provides:

In addition to meeting the individual professional qualifications above described, in order to qualify for delineated clinical privileges, other criteria will be used to evaluate applications for membership and/or clinical privileges including but not limited to the following:

1. The hospital's documented ability or inability to provide adequate facilities or supportive services for the applicant and his patients as determined jointly by the Medical Staff and Board of Trustees;
2. Patient care needs for additional staff membership with the applicant's skill and training;
3. The Health Center's management plan for the mix of patient care services to be provided as currently being implemented by the Board of Trustees.

exclusive access to those radiology facilities;

- there was no "need" for additional, non-CAR radiologists because CAR was required to fulfill all of St. Vincent's radiology needs; and
- the renewal of Lyons' clinical radiology privileges after she was disassociated from CAR would have been "inconsistent" with St. Vincent's "management plan" that was "currently being implemented", i.e., radiology services provided exclusively by CAR.

Lyons asserts, however, that these By-law provisions only apply to the initial application for clinical privileges and not to the reappointment/renewal process. We disagree.

Even though not specifically delineated in the process for reappointment/renewal of clinical privileges, those requirements are subsumed within Article V, Section 6, which provides that the Board, in reviewing an application for renewal of clinical privileges, must evaluate any "changes in pertinent personal and practice considerations" of the doctor. Correspondingly, any changes in the doctor's practice considerations will naturally affect and/or change the circumstances under which that doctor was initially allowed to use the hospital's facilities, and will require the Board to re-evaluate whether it can confer clinical privileges under the newly created circumstances.

In considering Lyons' application for renewal of clinical privileges, the Board, under By-law provisions identified above, had the ability to consider if the renewal of her clinical privileges was needed to provide radiology services, if it was able to provide adequate facilities, and whether granting her clinical privileges was consistent with St. Vincent's management goals.

■ Because of St. Vincent's exclusive contract with CAR for radiology services, the Board found that there was no "need" for additional radiologists because CAR provided all of those needs; it could not provide adequate clinical facilities for a physician not employed by CAR because CAR had exclusive use of those facilities; and to contract with additional radiologists outside of CAR would be "inconsistent" with its "management plan" as "currently being implemented" to provide radiology services through CAR as the exclusive provider. Moreover, when Lyons was hired by CAR, she knew full well that it had an exclusive contract to provide radiology services, that her clinical radiology privileges were only extended to her because she was employed by CAR, and, absent that employment, those privileges would never have been granted. She was also aware that upon ceasing her employment, those privileges would be forfeited. Because the By-laws allowed the Board to consider those factors, it was within its authority to deny Lyons' application for renewal of her radiology clinical privileges.

### III.

Even if the By-laws did not specifically allow the Board to take into consideration the effect of the exclusive contract when reviewing the renewal of clinical privileges, we would still hold that it was within the Board's power to do so. While there are no Pennsylvania cases that have specifically addressed under what circumstances a hospital can revoke the clinical privileges of a specialty doctor after the doctor has terminated her employment with an exclusive provider of that specialty service at the hospital, the Ohio Court of Appeals has dealt with this precise issue in *Williams v. Hobbs,* 9 Ohio App.3d 331, 460 N.E.2d 287 (1983). In *Williams,* an osteopathic physician specializing in radiology was employed by a radiology group that provided services to Doctors Hospital and was an associate member of the hospital's staff. As a result of an internal dispute, the physician was expelled from the radiology group and, although he retained his position on the medical staff, he lost his clinical radiology privileges. Similar to this case, the physician filed suit seeking, *inter alia,*

to enjoin the hospital from terminating his radiology privileges and alleging that there was nothing in the hospital's Code of Regulations that allowed it to terminate his clinical privileges merely because it had an exclusive contract with the radiology group.

Noting that Doctors Hospital had the ability to enter into an exclusive contract in furtherance of its control and management of the hospital, the Ohio Court of Appeals held that when the physician ceased employment with the exclusive provider, nothing prevented Doctors Hospital from withdrawing the physician's clinical privileges at the hospital. It stated:

> Exclusive contracts have been generally upheld as a reasonable exercise of a hospital's board of trustees' power to provide for the proper management of the hospital.... In the instant cause, prior to the board of trustees' denying [the physician's] clinical privileges in the radiology department, [the physician] was an employee of the [radiology] group which, pursuant to its exclusive contract with the hospital, was to provide all its radiology services. When he was expelled from the [radiology] group, [the physician] lost his radiology clinical privileges. *He was no longer qualified to exercise said clinical privileges because only members of the [radiology] group were qualified to exercise said privileges as a result of the exclusive contract.* We conclude that [the hospital] did not violate its Code of Regulations when it terminated the radiology clinical privileges of [the physician] because of the hospital's exclusive contract with [the radiology group]. (Citations omitted; emphasis added).

*Id.* at 292; *see also Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (doctor's employment as pathologist at hospital determined by exclusive contract between hospital and pathology group and contract was not illegal under antitrust laws).

■ Likewise, here, we find nothing in the By-laws that would preclude St. Vincent from withdrawing or not renewing Lyons' clinical privileges, and agree with the reasoning of the Ohio Court of Appeals that once a doctor is terminated from her employment with an exclusive provider of that hospital, clinical privileges at the hospital can be withdrawn. To hold otherwise would place Lyons' clinical privileges above the Board's decision to contract out the operation of its radiology department and to give exclusive access to a group of radiologists. Both St. Vincent's medical By-laws and its corporate By-laws [17] place solely in the Board the authority to manage its affairs. Managing [18] the affairs of St. Vincent includes decisions on how it is to operate and whether to enter into exclusive contracts for the operation of its radiology department. It is not up to the courts to second guess hospitals in their

**17.** Article V, Section 1 of the corporate By-laws specifies that, "the management and operation of the affairs" of St. Vincent are vested in the Board and the Board "has the ultimate responsibility" for the hospital in that:

> No assignment, referral, or delegation of authority by the [B]oard ... to the medical staff shall prevent the Board from exercising the authority required to meet its responsibility for conduct of the [hospital]. The Board retains the right to rescind any such assignment, referral or delegation of authority.
>
> The legal and governing powers of the corporation shall be vested in the voting members of the Board ... who have responsibility for the management of the property,

affairs and funds of the corporation, and who shall have the power and authority to do and perform all acts and functions not consistent with these bylaws, the corporate charter of the corporation, or any law affecting the affairs of the corporation.

**18.** In both *Dutta v. St. Francis Regional Medical Ctr.,* 254 Kan. 690, 867 P.2d 1057 (1994) and *Anne Arundel General Hospital, Inc. v. O'Brien,* 49 Md.App. 362, 432 A.2d 483 (1981), those courts held that a private hospital's entry into an exclusive contract with another radiologist to provide radiology services upon termination of the plaintiff radiologist's contract was a managerial decision not subject to the fair hearing procedures of their respective by-laws.

decisions as to the best way to deliver services; it is up to the institution itself.[19]

Consequently, because there is nothing in St. Vincent's By-laws that foreclosed the Board's ability to withdraw Lyons' clinical radiology privileges when she was no longer a member of CAR, the exclusive contract provider of radiology services at St. Vincent, the trial court erred in granting a permanent injunction and ordering that Lyons be given access to the radiology facilities at St. Vincent. Accordingly, we reverse.

## ORDER

AND NOW, this 22nd day of April, 1999, the order of the Court of Common Pleas of Erie County at No. 305–1992 consolidated with 46–E–1991, dated April 15, 1998, is reversed.

---

**19.** St. Vincent also contends that as a result of our Supreme Court's decision in *Cooper v. Delaware Valley Medical Center, et al.*, 539 Pa. 620, 654 A.2d 547 (1995), courts cannot order injunctive relief that would require hospitals to grant doctors access to hospital facilities, and the only relief available for a physician who alleges that he or she has been improperly denied access to the hospital is a claim for monetary damages. *See also Saad v. Sacred Heart Hospital,* 700 A.2d 604 (Pa.Cmwlth. 1997); *Zikria v. Western Pennsylvania Hospital,* 447 Pa.Super. 80, 668 A.2d 173 (1995). However, Lyons contends that *Cooper, Saad* and *Zikria* involved the grant and not the withdrawal of privileges, and if a plaintiff cannot sue for specific performance on the contract as imposed through operation of the hospital's by-laws, it renders that contract meaningless. Because of the manner in which we have resolved this case, we do not reach the issues of whether equity courts have the ability to order doctors back on the staff who have had their privileges withdrawn or whether money damages is the sole remedy. For the same reason, we do not address whether Lyons has demonstrated irreparable harm.