Unified Judicial System

 

 
 Drs. John Mahan, James Macdougall, Michael Holte, Chester Mayo, Matthew Reynen, and Donald Frisco, Individuals, and Residents of Aberdeen, South Dakota, and Orthopedic Surgery Specialists, LTD.,
Plaintiffs and Appellees
v.
Avera St. Lukeâs, a South Dakota Non-Profit Community Hospital
Defendant and Appellant
[2001 SD 9]
South Dakota Supreme Court
Appeal from the Circuit Court of The Fifth Judicial Circuit
Brown County, South Dakota
Hon. Larry H. Lovrien, Judge
Chester A. Groseclose, Jr. 
Richardson, Groseclose, Wyly, Wise & Sauck 
Aberdeen, South Dakota 
and 
Richard G. Braman 
Thomas S. Darling 
Gray, Plant, Mooty, Mooty & Bennett 
Minneapolis, Minnesota
Attorneys for plaintiffs and appellees
 
Edwin E. Evans 
Melissa C. Hinton 
Davenport, Evans, Hurwitz & Smith 
Sioux Falls, South Dakota
Attorneys for defendant and appellant
 
Considered on Briefs April 26, 2000
Reassigned 10/26/2000
Opinion Filed 1/10/2001
 
 
GILBERTSON, Justice (on reassignment).
[Â¶1.] Orthopedic Surgery Specialists (OSS), a South Dakota corporation, and its individual physicians, commenced this action against Avera St. Lukes (ASL) alleging breach of contract.  The trial court granted OSS' motion for summary judgment and entered a mandatory permanent injunction against ASL.  ASL then filed this appeal.  We reverse.
FACTS AND PROCEDURE
[Â¶2.] ASL is a private, nonprofit, general acute care hospital located in Aberdeen, South Dakota, organized under the nonprofit corporation laws of South Dakota.  ASL is part of Avera Health, a regional health care system sponsored by the Sisters of Presentation of the Blessed Virgin Mary of Aberdeen, South Dakota.  Since 1901, the Presentation Sisters have been fulfilling their mission statement âto respond to Godâs calling for a healing ministry . . . by providing quality health servicesâ to the Aberdeen community.  ASL has expanded its mission beyond the Aberdeen community to become the only full-service hospital within a 90-mile radius of Aberdeen. 
[Â¶3.] As required by SDCL 47-23-13, ASL is governed by a Board of Trustees (Board), which manages its affairs.  The Board consists of 15 members from Aberdeen and surrounding communities, including five physicians and four Presentation Sisters.  It is the duty of the Board â[t]o implement the purpose and objectives of [ASL] as determined by the Members of [ASL] and in accordance with the Statement of Philosophy of the Presentation Sisters.â  By-Laws of St. Lukeâs Midland Regional Medical Center (Corporate Bylaws), art V, Â§ 14(b).  Membership in ASL is limited to âreligious Members of the Congregation of the Sisters of the Presentation of the Blessed Virgin Mary of Aberdeen, South Dakota.â  Corporate Bylaws, art I, Â§ 3. 
[Â¶4.] In mid-1996, ASL's neurosurgeon left Aberdeen.  After his departure, the Board passed a resolution to recruit two neurosurgeons or two spine‑trained orthopedic surgeons to fill the void.  During the recruitment process, ASL learned that most neurosurgeon applicants would not be interested in coming to Aberdeen if there was already an orthopedic spine surgeon practicing in the area.  This was due to the small size of the community and the probable need for the neurosurgeon to supplement his or her practice by performing back and spine surgeries.  Back and spine surgeries are also performed by orthopedic spine surgeons and the applicants were doubtful whether Aberdeen could support the practice of both a neurosurgeon and an orthopedic spine surgeon.
[Â¶5.] ASL was successful in recruiting a neurosurgeon who arrived in December, 1996.  Around this time, ASL learned that OSS, a group of Aberdeen orthopedic surgeons, had decided to build a day surgery center that would directly compete with ASL.  During the first seven months that OSSâ surgery center was open, ASL suffered a 1000 hour loss of operating room usage.
[Â¶6.] In response to the loss of operating room income, ASL's Board passed two motions on June 26, 1997.  The first motion closed ASL's medical staff with respect to physicians requesting privileges for three spinal procedures:  (1) spinal fusions, (2) closed fractures of the spine and (3) laminectomies.  The second motion closed ASL's medical staff to applicants for orthopedic surgery privileges except for two general orthopedic surgeons being recruited by ASL.  The effect of âclosingâ the staff was to preclude any new physicians from applying for privileges to use hospital facilities for the named procedures.  The Boardâs decision did not affect those physicians that had already been granted hospital privileges, including the physician-members of OSS.  In making its decision, the Board specifically determined that the staff closures were in the best interests of the Aberdeen community and the surrounding area.  
[Â¶7.] In the summer of 1998, OSS recruited Dr. Mahan (Mahan), a spine‑fellowship trained orthopedic surgeon engaged in the practice of orthopedic surgery.  While OSS was recruiting Mahan, one of the OSS physicians advised Mahan that the staff at ASL had been closed to orthopedic surgery privileges.  Despite this warning, Mahan began practicing with OSS.  On at least two occasions, Mahan officially requested an application for staff privileges with ASL.  These requests were denied due to the Board's decision on July 26, 1997.
[Â¶8.] In September of 1998, Mahan and OSS (Plaintiffs) commenced this action against ASL, challenging the Boardâs decision to close the staff.  Plaintiffs claimed that the action was a breach of the medical/dental staff bylaws (Staff Bylaws) and sought a writ of mandamus and permanent injunction ordering ASL to consider Mahanâs application for hospital privileges.  Both parties submitted cross motions for summary judgment.  After a hearing, the circuit court determined that ASL had breached the Staff Bylaws by closing the staff.  In making its decision, the circuit court relied exclusively on the Staff Bylaws.  The circuit court determined that the Board had delegated a significant amount of its power and authority concerning staff privileges to the medical staff.  The circuit court reasoned that because of this delegation, the Board no longer had the power to initiate actions that affected the privileges of the medical staff.  The circuit court concluded the Board had breached its contract with the medical staff when it closed the staff to the named procedures without first consulting the staff.  Plaintiffsâ request for a permanent injunction was granted, requiring ASL to consider Mahanâs application for privileges.  ASL appeals raising the following issues:
1.                  Whether the individual OSS physicians have standing to challenge the Boardâs decision.
 
2.                  Whether the Boardâs decision breached its contract with the Staff.
 
ANALYSIS
 
[Â¶9.] 1.         Whether the individual OSS physicians have standing to 
challenge the Boardâs decision.
 
[Â¶10.] It is well settled in South Dakota that "a hospital's bylaws constitute a binding contract between the hospital and the hospital staff members."  Read v. McKennan Hospital, 2000 SD 66, Â¶14, 610 NW2d 782, 785 (citing St. John's Hospital Medical Staff v. St. John Regional Medical Center, Inc., 90 SD 674, 679, 245 NW2d 472, 474 (1976)).  It is also well settled that when such bylaws are approved and accepted by the governing board they become an enforceable contract between the hospital and its physicians.  See Northeast Georgia Radiological Assoc. v. Tidwell, 670 F2d 507, 511 (5th Cir 1982); Janda v. Madera Community Hosp., 16 FSupp2d 1181, 1188 (ED Cal 1998); Terre Haute Regional Hosp., Inc. v. El‑Issa, 470 NE2d 1371, 1377 (IndCtApp 1984).
[Â¶11.] Only parties to a contract have rights in the contract.  As such, the parties to the contract are the only ones who can seek enforcement of the contract.  See Leonard v. Leonard, 529 NW2d 208, 211 (SD 1995).  The OSS staff doctors are currently members of the medical staff at ASL; they are a party to the contract between ASL and the medical staff.  However, merely being party to a contract is not enough to have standing.
[Â¶12.] "Generally, for a litigant to have standing to bring an action before the court, the litigant must 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'"  Parsons v. South Dakota Lottery Commission, 504 NW2d 593, 595 (SD 1993) (quoting Gladstone, Realtors v. Bellwood, 441 US 91, 99, 99 SCt 1601, 1608, 60 LEd2d 66, 76 (1979)).  In regard to whether the OSS staff doctors suffered an injury, the circuit court found:
It is undisputed that the Board's decision resulted in an economic benefit for ASL and an economic hardship for these doctors in their private medical practice, OSS.  It is also undisputed that the OSS staff doctors, through their medical corporation OSS, spent time and money to recruit Mahan, only to end up with him unable to perform certain procedures because of his inability to obtain staff privileges at ASL.  As a result, the OSS staff doctors have had to support Mahan while being unable to build their practice or increase their patient base as expected.  Clearly [the OSS] [d]octors . . . have standing.
 
The circuit court properly found that the OSS staff doctors have standing to bring a cause of action for breach of contract.
[Â¶13.] 2.       Whether the Boardâs decision breached its contract with 
the Staff.
 
[Â¶14.] A.      The relationship and specific terms of the Bylaws.
[Â¶15.] As noted, in South Dakota, bylaws constitute a contract between a hospital and its medical staff.  Read, 2000 SD 66, Â¶14, 610 NW2d at 785.  As such, in this case we are called upon to construe the bylaws that are at issue.  In so doing we apply the normal principles for construction and interpretation of a contract. St. Johnâs, 245 NW2d at 475.  We review the construction of a contract under the de novo standard as a question of law.  Read, 2000 SD 66, Â¶22, 610 NW2d at 786.
[Â¶16.] Under South Dakota law, â[t]he affairs of a [non-profit] corporation shall be managed by a board of directors.â  SDCL 47-23-13 (emphasis added).  More specifically, ARSD 44:04:04:02.01 states that a hospital is required to have âa medical staff organized under bylaws and rules approved by the governing body and responsible to the governing body of the hospital for the quality of all medical care provided patients in the hospital and for the ethical and professional practices of its members.â  (emphasis added).  These directors âpossess a large amount of discretionary power within the limits of their legal authority, and in the exercise of business judgment in the performance of their duties.â  18B AmJur2d Corporations, Â§ 1486.  Pursuant to its authority, the Board of ASL has delegated certain powers associated with the appointment and review of medical personnel to its medical staff.  These designated powers are manifested in the Staff Bylaws.  Plaintiffs now claim that the Staff Bylaws trump the decision-making ability of the Board as to all decisions relating in any way to, or incidentally affecting, medical personnel issues.  We do not agree.
[Â¶17.] The circuit court failed to give sufficient weight to the fact that the Staff Bylaws are derived from the Corporate Bylaws.  Under Article XIV, section 14(u) of the Corporate Bylaws, any powers supposedly granted under the Staff Bylaws must originate from, and be authorized by, the Board pursuant to the Corporate Bylaws.  Their legal relationship is similar to that between statutes and a constitution.  They are not separate and equal sovereigns.  The former derives its power and authority from the latter.  Hence, to determine whether the staff was granted the power that it now claims to posses, any judicial analysis must begin with an examination of the Corporate Bylaws.  Article V, section 1[1]  states that â[t]he business and the property of the Corporation shall be managed and controlled, . . . by a Board of Trustees . . . .â  In addition, the Corporate Bylaws provide that:
[a]ll the corporate powers, except such as herein reserved to the Members[2]  of the Corporation, and except such as are otherwise provided for in these By-Laws and in the laws of the State of South Dakota shall be vested in and shall be exercised by the Members of the Board of Trustees.  
 
Id., Â§ 13.  
[Â¶18.] Therefore, the medical staff has no authority over any corporate decisions unless specifically granted that power in the Corporate Bylaws or under the laws of the State of South Dakota.  Plaintiffs have not alluded to any powers that arise under the statutory or common-law of South Dakota.  Therefore, we again return to an examination of the Corporate Bylaws.  Applicable is article V, section 14, which provides that: 
[t]he Members of the Board of Trustees shall have and exercise the authority in the management of the Corporation, as follows, but not in limitation, to wit:
. . .
(b)       To implement the purpose and objectives of the Corporation as determined by the Members of the Corporation and in accordance with the Statement of Philosophy of the Presentation Sisters.
. . .
(i)        To periodically examine its goals, its policies and the current programs of the hospital and to be responsible for the development of a mechanism that provides a systematic review of the quantity and quality of the services provided.
(j)        To ensure that personnel policies and practices that are adequate to support sound patient care are established and maintained.
. . .
(r)        . . . to analyze and evaluate data which reflects the communities [sic] present and projected health needs and accordingly develop a written plan for the hospitalâs growth and development; to provide appropriate physical and financial resources and personnel required to meet the needs of the community and the patients; and to make appropriate recommendations with respect thereto to the Members of the Corporation.
. . .
(u)       To delegate to the Medical Staff the authority to evaluate the professional competence of staff Members and applicants for staff privileges and to hold the Medical Staff responsible for making recommendations to the Members of the Board of Trustees concerning initial staff appointments, reappointments and the assignment or curtailment of privileges, all subject to the final approval of the Members of the Board of Trustees. . . .â  
(v)       To ensure the development of the Medical Staff ByLaws, Rules and Regulations which must state the policies under which the Medical Staff regulates itself, and to approve the same.  (emphasis added).
 
Under section 14(u), all that is designated to the medical staff is the responsibility to make recommendations to the Board regarding the professional competence of staff members and applicants.  Article XVI, section 1(a) directs the Board to organize the staff under medical-dental bylaws, which must be approved by the Board before they become effective.  Finally, article XVI, section 2(a) commands the Board to âassign to the medical-dental staff reasonable authority for ensuring appropriate professional care to the hospitalâs patients.â  (emphasis added).  
[Â¶19.] Clearly, under these explicit powers, the Board has the authority to make business decisions without first consulting the medical staff.  Nowhere in the Corporate Bylaws is the staff explicitly authorized to make business decisions on behalf of the corporation.  Plaintiffs instead rely on the Staff Bylaws as their source of authority to assume the Boardâs power.  Yet, even within the Staff Bylaws, there is no explicit provision granting the medical staff control over personnel issues. Instead, the circuit court found that the actions of the Board violated âthe spirit of the bylaws taken as a whole.â  Such reliance on the âspirit of the [Staff] bylawsâ turns the corporate structure of ASL upside down, granting control over day to day hospital administration to a medical staff that is not legally accountable for the hospitalâs decisions, has no obligation to further the mission of the Presentation Sisters, and has unknown experience in running a hospital or meeting the medical needs of the community.  Such a result is contrary to South Dakota corporate law and thus cannot be allowed to stand.
[Â¶20.] When the Board made its decision to close the medical staff as to the three procedures on June 26, 1997, it was acting within the powers granted it in the Corporate Bylaws.  See art XIV, Â§ 14(r).  When making these decisions, the Board specifically determined that the staff closures were in the Aberdeen communityâs best interests, and were necessary to insure 24-hour neurosurgical coverage for the Aberdeen area.  By preserving the profitable neurosurgical services at ASL, the Board also insured that other unprofitable services would continue to be offered in the Aberdeen area.  When, as here, it is clear from the Corporate Bylaws that the Board has the authority to manage the corporation, that authority âwould necessarily include decisions on how to operate individual departments in order to best serve the corporationâs purposes . . . .  The cost of such care and promotion of community health is vitally important to the community and a legitimate concern for the board.â  Bartley v. Eastern Maine Medical Center, 617 A2d 1020, 1022 (Me 1992).  ASL cannot continue to offer unprofitable, yet essential services including the maternity ward, emergency room, pediatrics and critical care units, without the offsetting financial benefit of more profitable areas such as neurosurgery.  The Board responded to the effect that the OSS hospital would have on the economic viability of ASLâs hospital and the health care needs of the entire Aberdeen community.  These actions were within the power of the Board.  It surely has the power to attempt to insure ASLâs economic survival.  As such, the courts should not interfere in the internal politics and decision making of a private, nonprofit hospital corporation when those decisions are made pursuant to its Corporate Bylaws.
[Â¶21.] In this action, the circuit court determined that this was not an administrative decision by the Board.  Instead it held this was a decision regarding the âgranting or withholding [of] staff privileges,â and that the action fell âwithin the provisions of the medical staff bylaws.â  The circuit court concluded that the Board had âdelegated a significant amount of its power and authority concerning professional qualifications and staff privileges to the medical staff.â  According to the circuit court, in matters of personnel, the Board has only âsecondary approval authority . . .; no actions originate with the Board itself.â[3]   As support for this view, the circuit court cited to article III, section 2(a) of the Staff Bylaws.  That section provides as follows: 
Initial appointments and reappointments to the Medical staff shall be made by the Governing Body.  The Governing Body shall act on appointments, reappointment, or revocation of appointment only after there has been recommendation from the Medical Staff as provided in these Bylaws.  
 
The circuit court also cited a provision in the Credentialing Manual to support its claim that the Board has essentially only rubber stamp authority.  That provision states that â[t]he Board shall either accept or reject the recommendation of the Credentials and Executive Committee . . . .â  Credentialing Manual, section 1.5-7.  Finally, the circuit court found that the procedure for hearings and appellate review was further evidence that the Board was not allowed to originate any actions relating to the medical staff, it was only allowed to hear appeals.  Staff Bylaws, art VIII.  
[Â¶22.] These provisions have been misconstrued by the circuit court.  When the Board delegated power to the medical staff through the Staff Bylaws, it had the authority under the corporate bylaws to delegate only the âauthority to evaluate the professional competence of staff Members and applicants for staff privileges . . . .â  Corporate Bylaws, art V, Â§ 14(u).[4]   The purpose of this limited delegation of authority was to obtain input from the staff on areas of its expertise.  Decisions relating to the competence, training, qualifications and ethics of a particular physician are matters for which the medical staff is uniquely qualified, while the Board admittedly has limited expertise in those areas.  Under the Corporate Bylaws, it is only in those confined areas of expertise that the staff has any authority at all.  However, the Corporate Bylaws do delegate other duties to the staff when it holds the staff âresponsible for making recommendations to the Members of the Board of Trustees concerning initial staff appointments, reappointments and the assignment or curtailment of privileges.â  Id.  Clearly, the medical staff gives recommendations to the Board on issues relating to appointment and privileges.  However, this case is not about appointments or the assignment or curtailment of privileges.  It is about an administrative decision to close ASLâs staff for certain procedures, therefore, the medical staff has no part in the decision and the Staff Bylaws do not apply.  The circuit court has taken the responsibilities of the staff in certain areas and elevated them into authority and control over those areas.  This result was clearly not intended by either the Corporate Bylaws or the Staff Bylaws.
[Â¶23.] The sections of the Staff Bylaws relied upon by the circuit court provide additional evidence of non-application.  Article III, section 2 only applies to appointments, reappointments, or revocation of appointments of staff privileges.[5]   As previously noted, this case does not involve those procedures.  The procedure for hearings and review found in article VIII only applies if a decision by the Board âwill adversely affect [the practitionerâs] appointment to or status as a member of the Medical Staff or his exercise of clinical privileges . . . .â  Staff Bylaws, art VIII, Â§ 1(a).  The disputed action by the Board did not affect any physicianâs appointment or status as a member of the staff.  All physicians that had clinical privileges at ASL on June 26, 1997, retained those privileges.  Finally, the provision in the Credentialing Manual only applies to the application process, which is not at issue here because Mahan was never given an application for clinical privileges.  We cannot accept that the circuit courtâs analysis of the Staff Bylaws can somehow override the specific authority granted to the Board by the Corporate Bylaws of ASL.  Nor can we accept that the âspirit of the [Staff] bylaws taken as a wholeâ can usurp power away from ASLâs Board. 
[Â¶24.] Under the Corporate Bylaws, the Board has the authority to analyze and evaluate data reflecting the present and projected health care needs of the 
Aberdeen community.  In light of that data, the Board must develop a âplan for the hospitalâs growth and development; to provide appropriate physical and financial resources and personnel required to meet the needs of the community and the patients.â  Corporate Bylaws, art V, Â§ 14(r).  The Board determined that it was in the best interests of the community to provide 24-hour access to neurosurgical services.  To provide this coverage, ASL needed to recruit two neurosurgeons or two orthopedic spine surgeons.  To recruit the required personnel, the Board determined that it was necessary to close the staff of ASL as to the three procedures and orthopedic surgery privileges.  Under the Corporate Bylaws, this decision was reasonable and this Court has no legal basis to second-guess its decision. 
[Â¶25.] Within its broad powers of management, some of the business decisions made by the Board will undoubtedly impinge upon matters that relate to or affect the medical staff of the hospital.  This fact is unavoidable.  However, merely because a decision of the Board affects the staff does not give the staff authority to overrule a valid business decision made by the Board.  Allowing the staff this amount of administrative authority would effectively cripple the governing Board of ASL.  ASL would cease to function in its current corporate form if its staff were given such power.
[Â¶26.] In its decision, the circuit court attempted to distinguish between this present situation and the situation wherein a hospital enters into an exclusive contract.  We find this attempt to be unpersuasive.  An exclusive contract arises when the hospital contracts with an outside physician or group of physicians, whereby the hospital agrees that the physician or group of physicians shall be the only personnel allowed to use certain facilities in the hospital, such as radiology units or emergency room units.  Such exclusive contracts are common practice for most hospitals today, and have been almost universally found valid and enforceable, even if not explicitly provided for in the corporate bylaws.  Lyons v. St. Vincent Health Center, 731 A2d 206, 212 (Pa Comwlth 1999); Holt v. Good Samaritan Hosp. & Health, 590 NE2d 1318, 1320 (OhioApp 1990).  In the past, ASL has closed several areas of its facility to physicians not part of an exclusive contract.  Such areas include anesthesiology, radiology, emergency room care, pathology, EKG interpretation, pulmonary function interpretation and cardiac catherization.  
[Â¶27.] Plaintiffs do not allege that the prior exclusive contracts entered into by ASL are invalid.  Neither is it alleged that the Board does not have the authority to enter into such exclusive contracts.  Yet, they claim that the action of the Board they now challenge is somehow invalid.  There is no logical reason why ASL could close certain areas of its facility to all but a few physicians (via an exclusive contract), yet not be allowed to close its facilities to any new orthopedic surgeons performing certain, named procedures.  In a sense, ASL has entered into an implied exclusive contract with all current orthopedic spine surgeons.  The same implicit authority that allows the Board to enter into exclusive contracts allows it to close ASLâs staff as was done here.  
[Â¶28.] The circuit court also concluded[6]  that ASL must accept an application from any doctor wishing to have privileges at ASL.  According to the circuit court, it is then the responsibility of the medical staff to decide whether the applicant is competent to practice and whether the applicant resides in close proximity to the hospital.  If the staff is satisfied as to these two elements, then under the circuit courtâs analysis, ASL is required to grant the physician privileges at the hospital.  According to the circuit court, no other considerations can come into play because, âthe [Staff] bylaws do not provide for restrictions of the staff for any other reason.â  Such a construction of the Staff Bylaws reaches a result that is contrary to the Corporate Bylaws and common sense.  Are we to force ASL to grant privileges to every qualified physician that may stand at its doorstep and announce that he or she will henceforth be using the hospitalâs facilities, simply because the staff said they could?  Absent a clear grant of such power, the staff of any corporation does not have the kind of control that the circuit court would grant to the medical staff.  It is not disputed that there is no such clear mandate in this case, only the âspirit of the bylaws taken as a whole.â  The spirit of these bylaws cannot override the entire corporate structure of ASL.  The Board was only authorized to delegate to the staff reasonable authority to ensure appropriate professional care.  Corporate Bylaws, art XVI, Â§ 2(a).  The result reached by the circuit court gives the staff an unreasonable amount of authority that is violative of SDCL 47-23-13 and ARSD 44:04:04:02.01 and is impractical in a corporate business environment.[7]   Imagine the confusion and lack of clear lines of management authority that would ensue at the hospital if the Board had only the minimal amount of control over its medical staff that the circuit court would give it.
[Â¶29.] B.               Contractual Element of Good Faith.
 
[Â¶30.] We stated in Garrett v. Bankwest, Inc., 459 NW2d 833 (SD 1990), that â[e]very contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other partyâs right to receive the agreed benefits of the contract.â  Id. at 841 (citing Restatement (Second) of Contracts, Â§ 205 (1981)).  The term âgood faithâ generally indicates an absence of bad faith on behalf of a party to a contract.  Id. at 845.  Examples of bad faith performance include depriving the other party of a negotiated-for right under the contract, preventing the aggrieved party from receiving the benefits of the bargain, or interfering in the other partyâs performance of the contract.  Id. at 841, 845.
[Â¶31.] As previously noted, âa hospitalâs bylaws constitute a binding contract between the hospital and the hospital staff members.â  Read, 2000 SD 66, Â¶14, 610 NW2d at 785.  Because the Board accepted and approved the Staff Bylaws, a contract was formed between ASL and its medical staff.  This contract, like all in South Dakota, contains the implied covenant of good faith and fair dealing.  That implied covenant allows either party to sue for breach of contract âeven though the conduct failed to violate any of the express terms of the contract agreed to by the parties.â  Garrett, 459 NW2d at 841.  We assume this is what the circuit court meant by its reference to the âspirit of the bylaws.â  But the duty of good faith is not limitless.  Id.  Implied in the definition of bad faith is the idea that the actions were unreasonable, therefore, a breach of the covenant of good faith cannot exist when the parties act in a reasonable manner.
[Â¶32.] The Boardâs decision to close the hospitalâs facility for certain, named procedures was a reasonable administrative decision.  It had determined that the closures were necessary to insure the continued viability of the hospital.  The Board must be allowed to make such reasonable, independent decisions if it is to continue to provide comprehensive medical services to the Aberdeen community.  It should also be noted that the Board did not abrogate any right for which the staff had previously negotiated.  Nor was the medical staff denied the benefit of its bargain.  The rights and benefits that the staff is now claiming are not mentioned in the Staff Bylaws, nor are they delegated to the staff in the Corporate Bylaws.  It is clear from the record that the Board did not interfere with the staffâs performance of the Staff Bylaws.  It simply made an economically reasonable decision not to allow any 
additional physicians to perform the three named procedures and orthopedic surgeries.  Therefore, any allegations that ASL breached its implied duty of good faith must fail.
[Â¶33.] Hospitals have legally defined responsibilities and duties.  See Tenet Health Ltd. v. Zamora, 13 SW3d 464, 471 (TexApp 2000) (stating that â[a] hospital is not a mere hostery [sic] providing room and board and a place for physicians to practice their craft, but [an institution that] owes independent duties of care to its patients.â).  To carry out this duty, the Board must have the power to close its doors to certain physicians.  In fact, this power is nearly beyond refute.  See Imperial v. Suburban Hosp. Assân, Inc., 862 FSupp 1390, 1401 (DMd 1993) (noting that ââa private hospital has the right to exclude any physician from practicing therein, such exclusion rests within the sound discretion of the managing authorities.ââ); Hutton v. Memorial Hosp., 824 P2d 61, 63 (ColoApp 1991) (stating that there is nothing that ârequires a hospital to grant staff privileges to every physician who satisfies the minimum criteria set forth in its bylaws for obtaining such privileges.â); Sarin v. Samaritan Health Center, 440 NW2d 80, 82 (MichApp 1989) (declaring that â[t]he rule is well established that a private hospital has a right to exclude any physician from practising [sic] therein.â); Lewin v. St. Joseph Hosp., 146 CaRptr 892, 906-07 (CalCtApp 1978) (stating that âin every case brought to our attention in which a hospitalâs operation of a facility on a âclosed-staffâ basis was challenged, the decision of the governing authority of the hospital has been upheld.â).  
[Â¶34.] In addition, the negligent act of a doctor can impute liability to a hospital under a theory of respondeat superior unless it can be shown that the doctor was acting as an independent contractor.  40 AmJur2d Hospitals Â§ 28.[8]   Further, in Shamburger v. Behrens, 380 NW2d 659, 665 (SD 1986) we held that separate liability for negligence attaches to a hospital when it has breached its own standards, or those available in the same or similar community or hospitals generally, such as allowing a known incompetent doctor to remain on staff.  See also Goodman v. United States, 2 F3d 291, 293 (8thCir 1993) (applying South Dakota law).  It would be completely illogical to first impose a duty of reasonable care upon a hospital, and then later strip the hospital of the ability and power to implement the policies and programs required to fulfill that duty.
Conclusion
[Â¶35.] Because the actions of ASLâs Board were permissible under the Corporate Bylaws and done in good faith, there has been no breach of the contract between the Board and the staff.  Therefore, the circuit courtâs judgment is reversed.  The circuit courtâs imposition of a permanent injunction is likewise reversed.
[Â¶36.] MILLER, Chief Justice, and AMUNDSON and KONENKAMP, Justices, concur.
[Â¶37.] JOHNSON, Circuit Judge, concurs in part and dissents in part.
 
JOHNSON, Circuit Judge (concurring in part, and dissenting in part)
 
[Â¶38.] I concur with the majority on Issue I, but dissent on Issue II.
 
[Â¶39.] ASL ignored the Medical Staff Bylaws, which allow the active medical staff to vote and be heard concerning amendments to the bylaws.  Instead, ASL unilaterally made a business decision to close the medical staff to new orthopedic surgeons, except those which ASL was recruiting.  
[Â¶40.] ASL relies almost entirely on article III, Â§ 2(a) of the bylaws, which states:  "Initial appointments and reappointments to the medical staff shall be made by the Governing Body.  The Governing Body shall act on appointments, reappointments, or revocation of appointments only after there has been a recommendation from the medical staff as provided by these Bylaws."  This reliance is flawed.  This case deals with a unilateral amendment to the bylaws, without the prescribed approval of the medical staff, and not an appointment or reappointment.  
[Â¶41.] This Court has held that "medical staff bylaws do constitute a contract which is, by its express terms, subject to amendment when the amendment is agreed to by both the medical staff and medical center."  St. Johnâs Hosp. M. S. v. St. John Reg. M. C., 90 SD 674, 679, 245 NW2d 472, 475 (1976).  (Holding the board of directors unilateral amendments to the medical staff bylaws null and void without the participation and approval of the medical staff as provided in the bylaws).  "The principles which govern the construction of contracts also govern the construction and interpretation of corporate bylaws."  State v. Johnson, 124 NW2d 624, 626, 627 (Wis 1963).  As such, "where the terms of a contract are plain and unambiguous, the duty of the court is to construe it as it stands, giving effect to the plain meaning of the language used."  Id. 
[Â¶42.] In the case at hand, the following language in article XVI of ASL's bylaws clearly delegates to the active medical staff the power to vote and be heard when there are proposed amendments to the bylaws:  "The Bylaws, Rules and Regulations Committee shall review these Bylaws at least annually.  The review shall be times so that any proposed bylaw changes are ready for submission to the medical staff on or before the annual meeting."  Article XVI further notes:
[i]n the event that any member of the medical staff has a question or disagrees with the proposed changes in the Bylaws, . . . [d]iscussion from the floor regarding the changes in the Bylaws and Rules and Regulations may be conducted by those who desire to participate, following which change, revisions, or alterations shall be balloted upon.â  (emphasis added).
 
At no time did the Board of Trustees allow the medical staff to have any input or vote on the proposed changes to the bylaws as required.
[Â¶43.] Article XVII of the bylaws sets forth that "[t]he Bylaws together with the appended Rules and Regulations shall be adopted at any regular or special meeting of the active medical staff."  This means that the amendments to bylaws cannot be adopted unilaterally; the active medical staff must be present.[9]   
[Â¶44.] The trial court found:
[i]n reading the bylaws, as a whole, the Court concluded that the bylaws contemplate taking applications from any doctor who wishes to have staff privileges at ASL.  The bylaws do not contain any restrictions as to who may apply, they only put professional and logistical qualifications on who can be accepted to the staff.  These qualifications center on a physicianâs competence to practice medicine and his or her availability to be at the hospital.  They bylaws do not provide for restrictions of staff for any other reason.  Any other interpretation would lead to a result contrary to the spirit of the bylaws taken as a whole.  (emphasis in original).
 
[Â¶45.] There is no flaw in this conclusion.  The staff bylaws did not contain restrictions on who may apply for staff privileges, but did place restrictions on who may be accepted to the staff.  This was a benefit to the staff members, as it allowed them to recruit physicians to their clinics with the exception that the new doctors would receive staff privileges (to the only full service hospital within 90 miles of Aberdeen) if they met the professional and geographic requirements of the staff bylaws.
[Â¶46.] ASL unilaterally denied this benefit to staff members by blatantly ignoring the amendment provisions of the staff bylaws.  âEvery contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other partyâs right to receive the agreed benefits of the contract."  Garrett v. Bankwest, 459 NW2d 833 (SD 1990).  ASL's partial closure of the orthopedic staff, for strictly economic reasons, was not reasonable, not in good faith, and was a breach of contract.  Either party may sue for breach of contract "even though the conduct failed to violate any of the express terms of the contract agreed to by the parties."  Id. at 841.  The trial court was correct in issuing a permanent injunction requiring ASL to provide Dr. Mahan with an application for staff privileges.  
[Â¶47.] Accordingly, I would affirm the circuit court on Issue II. 
[Â¶48.] JOHNSON, Circuit Judge, sitting for SABERS, Justice, disqualified.
 

1.         References to article and section numbers will refer to those articles and sections in the Corporate Bylaws until stated otherwise. 
 

2.         As previously noted, members of the medical staff are not âmembersâ of the corporation.  Pursuant to the Corporate Bylaws, membership in the corporation is limited to âreligious Members of the Congregation of the Sisters of the Presentation of the Blessed Virgin Mary of Aberdeen, South Dakota . . . .â

3.         The circuit court further concluded that the Board is only allowed to give its âseal of approvalâ at the final stages of staff actions. 

4.         Another limitation on the Boardâs power to delegate authority is found in the Corporate Bylaws, article XVI, section 2(a), where it states that â[t]he Members of the Board of Trustees shall, in the exercise of their overall authority and responsibility, assign to the medical-dental staff reasonable authority for ensuring appropriate professional care to the hospitalâs patients.â (emphasis added).  Clearly, the degree of authority given to the staff by the circuit courtâs interpretation is not a reasonable amount of authority.
 

5.         Article III, section 2 of the Staff Bylaws states in part:
 
a.      Initial appointments and reappointments to the Medical staff shall be made by the Governing Body.  The Governing Body shall act on appointments, reappointments, or revocation of appointments only after there has been [a] recommendation from the Medical Staff as provided in these Bylaws.
. . .
c.   Appointment to the Medical Staff shall confer on the appointee only such clinical privileges as have been granted by the Governing Body, in accordance with these Bylaws. 
 

6.         Again, the circuit court relied upon the âspirit of the bylawsâ to reach this conclusion.

7.         It should be noted that under the circuit courtâs interpretation, the delegation of that much authority would be invalid as a violation of the Corporate Bylaws, because the Board would have granted more than reasonable authority.  We cannot conclude that the Board would have intended to violate the Corporate Bylaws when it enacted the Staff Bylaws.

8.         Given the fact that appointment to ASL medical staff, under its bylaws, carries with it elements of agency, adoption of the circuit courtâs rationale arrives at further legal difficulties.  In Lucey v. Vilhauer, 264 NW 203, 206 (SD 1935) (overruled on other grounds), we set forth the duty of an agent to its principal:
The law is well settled that the relation of an agent to his principal is one of confidence and trust.  It is the duty of the agent to act with the utmost good faith for the best interest of his principal in all dealings concerning or affecting the subject matter of the agency, and he must not place himself in such relations that his own interests or the interests of others whom he represents may become antagonistic to those of his principal.  It matters not how fair the conduct of the agent may have been nor that the principal was not injured.
            The circuit courtâs opinion elevates the interests of the staff, as agent, above the interests of ASL, as principal.  This clearly violates general agency principles and cannot be allowed.
 
Whether the medical staff are also employees presents a difficult question.  Cases from other jurisdictions arrive at different results, from that of employee to something akin to a corporate officer to that of an independent contractor.  A review of the ASL Staff Bylaws does not provide a definitive answer.  Other cases go beyond the definition used in that type of document and invoke some form of an âeconomic realitiesâ test.  In any event, our recent case of Setliff v. Akins, 2000 SD 124, 616 NW2d 878, which dealt with an employment dispute between doctors in a medical clinic, is instructive on agency principles as well.  We cited to SDCL 60-2-13 which states, â[a]n employee who has any business to transact on his own account, similar to that entrusted to him by his employer, must always give the latter the preference.â  We further concluded that although SDCL 60-2-13 does not flatly prohibit employees from pursuing their own interests, it does require an employee to prioritize.  Id., Â¶20, 616 NW2d at 887.  An employee must give preference to his employerâs business interests over his or her own.  Id. (citing Bushman v. Pure Plant Food Intern., Ltd, 330 NW2d 762, 763-64 (SD 1983)).
 
How can a doctor who is a part owner of the for-profit OSS be expected to fulfill his or her duties towards his or her co-owners and in the same instance fulfill the duties towards the principal, ASL, who is a not for profit hospital?  This does not imply ill-will on the part of the doctor, it simply faces fundamental medical issues such as at which institution does the doctor place his or her patients, OSS or ASL?  We have often stated that an agent cannot serve two masters.  This rule applies to medical professionals as well.

 9.         Clearly under articles XVI and XVII of the bylaws the board of directors have given the active medical staff power to alter, amend or repeal the bylaws and adopt new bylaws.  See SDCL 47-22-33 which provides:  "The power to alter, amend or repeal the bylaws or adopt new bylaws shall be vested in the board of directors unless otherwise provided in the articles of incorporation or the bylaws."  (emphasis added).